**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 1:25-cr-00327** |
| **MALACHI MORGAN THOMAS,** | ) | **Hon. Michael S. Nachmanoff** |
| | ) | **Sentencing: Sept. 24, 2026** |
| **Defendant.** | ) | |

**DEFENSE POSITION ON SENTENCING**

Over the course of approximately 7 months when Mr. Thomas had just turned 18-years old, he used another minor's Snapchat account to sexually exploit and intimidate various female minors. His behavior was horrendous and harmed multiple victims in devastating ways – that has never been disputed. But instead of prosecuting Mr. Thomas one time for this offense conduct related to his Snapchat activity, he has been prosecuted over the course of multiple years in both the state and federal systems and, each time, he has faced significant sanctions. Now, the government is asking that the Court effectively impose a life sentence on him.

Based on two separate state prosecutions in Prince William County and Fairfax County for his Snapchat communications with minors – one of which was predicated on resulting sexual assaults, Mr. Thomas is serving a collective 30-year sentence in the Virginia Department of Corrections ("VDOC"), with an expected release date in July 2050. Now, years later, after Mr. Thomas had begun serving his time in a state prison, the government has federally prosecuted Mr. Thomas once again for his Snapchat communications with different minors – but still from the

same Snapchat account, the same type of communications, and during the same 7-month timeframe. Although the government's own sentencing position focuses heavily on the state prosecutions as being a part of this federal case, it now takes an extremely narrow reading of the term "relevant conduct" to argue that at least the Fairfax County convictions are not relevant conduct to this federal case. That position is unsupported and is contrary to the government's own representations about how the state and federal cases are related, which is even outlined in the plea paperwork that the government drafted. If the Court were to impose the government's request for a 40-year consecutive sentence, for conduct that Mr. Thomas committed over a 7-month period when he was just 18 years old, he would be incarcerated until he was 90 years old. That is *not* just punishment.

Mr. Thomas has fully accepted responsibility for his behavior and acknowledged the harm he caused to the victims; that has never been a point of contention in either the state or federal cases. Indeed, when he was first interviewed by Fairfax County state detectives in October 2020, he admitted to essentially all of the offense conduct – not only to his sexual assaults of the two minors, but more broadly to his Snapchat communications with other minors. And years later, Mr. Thomas has continued to accept responsibility for his behavior. Although he pleaded guilty to just two counts in the indictment, he admitted to the offense conduct for all of the 15 charges, not just the counts of conviction.

The nature of the offense conduct is serious and concerning, but there is no doubt that Mr. Thomas' difficult and unstable upbringing – and specifically, the sense

of abandonment he felt and [redacted] – played a significant role in why he engaged in that behavior. His parents separated when he was one year old, and his father was absent for much of his childhood. [redacted]

Mr. Thomas' offense conduct clearly reflects an 18-year-old who was angry at the world for the abuse he suffered and the degradation to his own body, and took that anger out on those who were more vulnerable than he at that moment. Courts have recognized the mitigating role that an offender's age – such as here – plays in terms of culpability. Research on adolescent brain development has consistently shown that even between eighteen years old to early twenties, adolescents are significantly more likely to act impulsively and with less regard to consequences, to be reactionary to emotions than responsive to logical thoughts, and to be more likely to engage in risk-taking and sensation-seeking behaviors. *See* Exhibit 1 (Aaron Report) at pg. 2. An adolescent's developmental period is also heavily influenced by

external factors such as family violence and adversity, which can have "reverberating effects," even in later development of social skills, behavioral controls, and emotional functioning. *Id.* at pg. 4. Mr. Thomas is no exception to these principles.

Accordingly, the defense requests that the Court impose a 35-year sentence that, pursuant to U.S.S.G. § 5G1.3(b), runs concurrent with the remaining 24 years that Mr. Thomas has left to serve on the state sentences and is adjusted for the almost 6 years that Mr. Thomas has already served on his state sentences (starting from October 1, 2020 to September 24, 2026).[1] In effect, this sentence would result in a total period of 35 years incarceration between both state and federal jurisdictions. This is a significant sanction – Mr. Thomas would not be released from prison until he is 54 years old, at which point, he will have spent two-thirds of his life in prison.

This sentence serves the § 3553(a) goals to reflect respect for the law and the seriousness of the offense, to promote adequate deterrence, and to protect the public; but, this sentence also takes into account that Mr. Thomas was only 18 years old when he committed this offense conduct over the span of several months in 2020, how his difficult upbringing and youth played a central role in contributing to this behavior, and that he will be in his mid-50's when he is released from prison, which significantly reduces his risks of recidivism.

[1] Because Mr. Thomas has been in federal custody pursuant to a Writ of Habeas Corpus ad Prosequendum, he remains in the primary custody of the state, not the federal government. Meaning, all of this time is accredited to his state sentence.

## I. Factual and procedural background.

Over about a 7-month period – from March to October 2020 – Mr. Thomas used a Snapchat account that he took from a female minor to communicate with other female minors. Through that Snapchat account, Mr. Thomas directed minors to send him sexually explicit photos and videos of themselves, as well as to join live streams on the platform to do the same. His language during those communications was extremely graphic and, at times, violent. Through that same Snapchat account and during the same timeframe, he attempted to meet one minor in person and did meet two minors in person and he sexually assaulted them.[2] This same conduct formed the basis for both the state and federal prosecutions.

On October 1, 2020, Mr. Thomas was arrested by both Prince William County and Fairfax County law enforcement. *See* PSR at ¶¶ 206-207. After his arrest, Mr. Thomas waived his Miranda rights and spoke to Fairfax County law enforcement, where he admitted to being the sole person controlling the Snapchat account, communicating with minors to receive sexually explicit videos and photos, and sexually assaulting the two minors. *Id.* He received a total 30 year and 2-month sentence for both of those cases – 5 years and 2 months for the Prince William case (which was predicated on his possession of sexually explicit photos and videos of at

---

[2] In the government's sentencing position, it references alleged conduct between PWC Victim 1 and Mr. Thomas that happened in Fall 2019 – when Mr. Thomas would have been 17 years old. Although the PWC Victim 1 appeared to have filed police reports with Prince William County, no charges appeared to have resulted from those reports.

least one minor), to be served consecutively; and 25 years on the Fairfax case (which was predicated on the two sexual assaults).[3] *Id.*

While those two state cases were pending, a federal investigation was opened in 2021. *See* PSR at ¶ 18. About one year after Mr. Thomas' state court cases were resolved and he was designated to Green Rock Correctional Center to serve his sentences, he was indicted in this court in December 2025 with 15 counts based on his communications with 13 minors through that same Snapchat account and from that same timeframe at issue in the state cases (March to September 2020), and his possession of visual depictions of those minors – including the minors in the state prosecutions. *See* Dkt. No. 1. Based on a federal writ, Mr. Thomas was transferred from his VDOC facility to the Alexandria Detention Center; his first appearance in this Court was on January 2, 2026. Several months later, on April 2, 2026, Mr. Thomas pleaded guilty to two counts in the indictment but pursuant to the plea agreement, admitted to the offense conduct for all 13 minors.[4]

[3] While he was awaiting trial for his Prince William and Fairfax County cases, Mr. Thomas was charged and later convicted of indecent liberties based on his communications with a female minor to send sexually explicit pictures of herself. *See* PSR at ¶ 208. The Fairfax Court imposed 10 years' incarceration to run concurrent with his 25-year sentence imposed by Fairfax Court. *Id.*

[4] For MV2, Mr. Thomas was 18 years old at the time and MV2 was 15 years old. He traveled to see her and have sexual interactions with her, which were not by force. Pursuant to that state's law, a minor between 13- to 17-year-old may be in a sexual relationship if their partner is no more than four years older. Although Mr. Thomas' communications with MV2 that formed the basis for Count 2 were illegal, the actual in-person sexual interactions were not.

What is clear from the procedural history of both Mr. Thomas' state and federal cases is that he demonstrated acceptance of responsibility for his behavior. Mr. Thomas pleaded guilty in his state cases, and the courts imposed a significant sanction of 30 years. Mr. Thomas had come to terms with his foreseeable future in a custodial setting and what that meant for him, especially in terms of his relationship with his family – he would miss celebrating their milestones, such as his younger siblings starting college, and would be unable to grieve with them during the difficult times, such as the recent passing of his grandmother. Mr. Thomas started serving his custodial sentence at a VDOC facility and, when he was arrested for this federal case, he mentally spiraled at the thought of once again facing life in prison for conduct he committed years earlier when he was 18 years old. Despite his struggle being back in a local jail pending the resolution of this federal case, Mr. Thomas took accountability and resolved this case within a matter of a few months.

## II. Legal standard.

This Court's primary directive at sentencing is to "impose a sentence sufficient, but *not greater than necessary*, to comply with the purposes" of sentencing – that is, the minimum amount necessary. 18 U.S.C. § 3553(a) (emphasis added). The sentencing guidelines are just that, guidelines. *See United States v. Booker*, 543 U.S. 220, 259-60 (2005). Moreover, the sentencing guidelines are only one of more than a

half-dozen statutory sentencing factors enumerated in 18 U.S.C. § 3553(a) that this Court must take into consideration in fashioning the appropriate sentence.[5]

## III. Section 5G1.3(b) directs that Mr. Thomas' federal sentence be adjusted to account for the time that he has already served on his state sentence and to run concurrent to the remaining undischarged term of incarceration for those sentences to achieve fairness and to avoid grossly increasing his overall sentence.[6]

The PSR correctly found that Mr. Thomas' two prior state convictions in Prince William County and Fairfax County constitute relevant conduct. That is because those state prosecutions involved Mr. Thomas' communications with three minors on the *same* Snapchat account, having the *same* types of sexually explicit and graphic conversations with them, during the *same* 7-month timeframe, and he also possessed sexually explicit photos and videos of those three minors that formed the basis for Count 15 in the indictment. This is all agreed upon by the parties in the Statement of Facts. *See, e.g.*, PSR at ¶¶ 20-88.

---

[5] Those sentencing factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

[6] The only outstanding objection to the PSR is the defense's objection to the application of the two-level enhancement for the offense involving the commission of a sexual act or sexual contact with regard to MV1, MV5, and MV7. The defense rests on the basis for the objections set forth in the PSR (*see* PSR at pgs. 61-62) and notes that the enhancements ultimately have no impact on the final offense level, which is 43 regardless of the enhancement's application.

The PSR therefore correctly did not assess any criminal history points for those two state convictions under U.S.S.G. § 4A1.2(a)(1) (*see* PSR at ¶¶ 206-207) and found that the federal sentence should be adjusted to reflect time that Mr. Thomas has already served on those state sentences and to run concurrent with the remaining undischarged term of incarceration on those sentences under U.S.S.G. § 5G1.3(b) (*see id.* at pg. 55 FN 6).

The government did not object to either of these points in the PSR (*see* PSR at pg. 61). But for the first time in its sentencing position, argues that the state convictions are not relevant to the instant federal case. In doing so, the government specifically argues that the sexual assaults of the two minors in Fairfax County are not relevant to Mr. Thomas' federal convictions of sexual exploitation of a different minor and possession of child sexual abuse material, including recordings of those sexual assaults. The government does not appear to argue that the state Prince William case is not relevant conduct. But regardless, the government's narrow reading of "relevant conduct" is not consistent with how that term is broadly defined in the guidelines,[7] and its position goes against how the government has always viewed the state cases and the federal case as one continued course of conduct.

---

[7] When establishing whether the underlying conduct is "relevant" pursuant to U.S.S.G. § 5G1.3(b) is based on how § 1B1.3(a)(1), (a)(2), or (a)(3) defines "relevant conduct." Under § 1B1.3(a)(2), relevant conduct constitutes "acts or omissions…that were part of the same course of conduct or common scheme or plan as the offense of conviction." The Guidelines lists factors used to determine when offenses constitute the "same course of conduct or common scheme or plan," including: "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." §1B1.3, cmt. n.5(B)(ii). A strong showing of one factor can outweigh a lack of showing another. *See U.S. v. Hodge*, 354 F.3d 305, 313 (4th

Indeed, when looking at even the government's first few pages of its sentencing position, it clearly acknowledges that these cases are all related conduct:

> Operating under the guise of a cybercriminal organization, the defendant enticed and extorted more than 40 minor girls to create sexually explicit images and videos of themselves, or else face retribution from the 'organization.' . . . In some cases, the defendant threatened the child victims with rape if they did not comply. . . *The defendant carried his online threats and extortion one step further, meeting and attempting to meet several of his victims in person for sex.*

*See* Gov. Pos. 26 (Dkt. No. 26) at pgs. 1-2 (emphasis added). The government then proceeds to refer to both the Prince William and the Fairfax cases as a part of this overarching offense conduct. *Id.* at pg. 2. And in fact, the government required that Mr. Thomas admit to his prior conduct in the state cases as a part of the Statement of Facts in this case. *See, e.g.*, PSR at ¶¶ 79, 81 (quoting the Statement of Facts). It is clear that these cases are relevant conduct: the government's position reflects an effort to avoid the clear application of a § 5G1.3(b) to support its request for a consecutive sentence so that Mr. Thomas serves life imprisonment.

Section 5G1.3(b) states that "the sentence for the instant offense *shall* be imposed as follows: (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal

---

Cir. 2004) (noting that the regularity in narcotics trafficking made up for the long temporal gap between the relevant conduct). In fact, the Fourth Circuit considers the concept of "same course of conduct" to be broader than that of "common scheme or plan." *Hodge*, 354 F.3d at 313. For acts to form part of the same course of conduct, they need not "be connected together by common participants or by an overall scheme." *Id.* For example, the Court found that drug transactions happening across a three-year period still qualified as the same course of conduct. *Id.*

sentence by the Bureau of Prisons; and (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." *See* § 5G1.3(b)(1)-(2) (emphasis added). In the background section of this specific guideline, the commentary acknowledges that federal courts have broad discretion when imposing sentences concurrently versus consecutively, but states that "[e]xercise of that discretion, however, is predicated on the court's consideration of the factors listed in 18 U.S.C. § 3553(a), including any applicable guidelines or policy statements issued by the Sentencing Commission." *See* § 5G1.3, Background.

The purpose in promulgating § 5G1.3 reflects the Sentencing Commission's concern regarding fairness and equity for "the situation in which a defendant is prosecuted in more than on jurisdiction for related conduct." *See United States v. Rouse*, 362 F.3d 256, 262 (4th Cir. 2004) (citing *Witte v. United States*, 515 U.S. 389, 404 (1995)). As the Supreme Court has stated, this guideline is meant to "achieve some coordination of sentences imposed in such situations with an eye toward having such punishments approximate the total penalty that would have been imposed had the sentences for the different offenses been imposed at the same time (*i.e.*, had all of the offenses been prosecuted in a single proceeding)." *Id.* (citing *Witte*, 515 U.S. at 404-405). Meaning, this guideline "operates to mitigate the possibility that the fortuity of two separate prosecutions will *grossly* increase a defendant's sentence." *Id.* (citing *Witte*, 515 U.S. at 405) (emphasis added).[8]

---

[8] Indeed, although the sentencing guidelines are advisory, a former Commissioner of the Sentencing Commission from 2013 to 2018, William Pryor (Chief Judge, Eleventh Circuit), recently wrote a dissenting opinion where he stated that § 5G1.3 is

This guideline is meant to achieve fairness in sentencing for defendants who are subjected to multiple prosecutions for related conduct, not as a mechanism for a defendant to escape punishment, as the government indicates. The importance of this guideline is central to Mr. Thomas' case: his two prior state prosecutions and the instant federal prosecution stem from his online communications with minors through the same Snapchat account, involve the same type of communications, and during the same timeframe when he was just 18 years old. Therefore, consistent with § 5G1.3(b), the Court should impose a 35-year concurrent sentence to his state sentences, to be adjusted almost 6 years to reflect the time that he has already served on his state sentences. In total, this will reflect a total period of incarceration of 35 years between both state and federal jurisdictions.

## IV. Sentencing argument.

### a. Mr. Thomas' formative years were marked by instability, abuse and lack of a consistent caregiver, which resulted in mental health and substance use struggles.

Mr. Thomas, now only 24 years old, was born in Woodbridge as the first child to married parents, who both served in the military. PSR ¶¶ at 216-217. Mr. Thomas'

---

mandatory when applicable. *See United States v. Henry*, 1 F.4th 1315, 1328 (11th Cir. 2021) (J. Pyror, Dissenting). In so finding, Judge Pyror found that "[a]lthough *Booker* held the guideline *range* advisory, it did not make every provision of the Guidelines optional." *Id.* at 1331. Meaning, if the guideline provision speaks to the guidelines range, then district courts may of course vary from the sentencing range, but if the provision "dictates the kind of sentence available, then *Booker* provides no basis to disregard the mandatory language in the guideline." *Id.* at 1332. Because § 5G1.3(b) does not reduce the defendant's guidelines range, but is primarily about which kind of sentence a court should impose – concurrent or consecutive – only after the court calculates the guidelines range and determines the appropriate total punishment, the provision is mandatory. *See generally id.* at 1332-1334.

father was deployed while his mother was pregnant and during his birth, so he only first met his son when he was about 4 months old. The strain of his father being absent and his mother's mental health struggles caused his parents to separate when Mr. Thomas was only 1 year old. *Id.* at ¶ 217. His father moved to his hometown of St. Louis, Missouri, and his mother was left to raise Mr. Thomas, with the help of family, primarily in the Northern Virginia area. *Id.* However, when Mr. Thomas was very young and his parents had separated, his mother's struggles led his grandmother in Louisiana to take custody of him for about two years while his mother tried to secure a stable living situation for them. *Id.* at ¶ 226. His parents officially divorced when he was still a toddler, and Mr. Thomas would only see his father periodically on school breaks and in the summers. *Id.*

Mr. Thomas' mother remarried twice – once when Mr. Thomas was about 4 years old and again when he was about 10 years old – and neither of the husbands were positive influences. [redacted]

[redacted]

Mr. Thomas' teenage years were further complicated by his mother's struggle with cancer, Lupus and anemia. *Id.* at ¶ 217. She was often gone for treatment and hospitalized. Mr. Thomas struggled with her diagnoses and absences, and attended counseling sporadically through the military. *Id.* at ¶ 230. [redacted]

[9] *See* United States Department of Justice, *Youth Victimization: Prevalence and Implications*, available at https://www.ojp.gov/pdffiles1/nij/194972.pdf (published April 2003).

[redacted]

During this same time as a teenager, Mr. Thomas began experimenting with alcohol consumption, presumably as a form of self-medication for all the trauma he experienced. His alcohol use was so extreme that he was hospitalized for alcohol poisoning when he was 16 years old, and when he was feeling depressed in college, he would often lock himself in his room and drink until he could physically not consume anymore. *Id.* at ¶ 234. After he started attending college, Mr. Thomas began using molly, oxycodone, mushrooms and marijuana, presumably, again, to numb the unsettling emotions he was feeling. *Id.* at ¶ 235. Tellingly, he admitted to smoking marijuana with his mother, his primary adult role model, when he was on state probation. *Id.* at ¶ 236. He admits that he would benefit from substance use treatment and would willingly participate. *Id.* at ¶ 237.

**b. The multitude of Adverse Childhood Experiences ("ACE"s) Mr. Thomas experienced in his childhood have been shown to negatively impact adolescent brain development.**

The original ACE Study – conducted by Kaiser Permanente in collaboration with the Centers for Disease Control and Prevention (CDC) – examined 10 categories of adverse childhood experiences: physical, sexual, and emotional abuse; physical and emotional neglect; household mental illness; household substance abuse; an incarcerated household member; a mother or stepmother treated violently; and

parental separation or divorce.[10] The study surveyed over 17,000 predominantly white, middle- and upper-middle-class, college-educated participants with employer-provided health insurance.[11] The study's central finding was that as the number of ACEs increased, so did the risk of negative physical health and behavioral outcomes in adulthood.[12] A separate study examining ACEs in an urban population found that children with four or more ACEs were significantly more likely than children with no ACEs (51.2% v. 3%) to experience learning and behavioral difficulties.[13]

Mr. Thomas suffered at least seven ACEs – parental separation, household mental illness, household domestic violence, an incarcerated household member, emotional abuse, [redacted]. Research on toxic stress indicates that ACEs can disrupt the function and structure of children's developing brains.[14] That same body of research also emphasizes the brain's capacity for resilience and recovery when subsequent treatment is trauma-informed and

---

[10] *See* Felitti VJ, Anda RF, Nordenberg D, et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study*, Am J Prev Med. 1998;14(4):245-258.

[11] *Id.*

[12] *Id.*

[13] *See* Burke *et al.*, *The Impact of Adverse Childhood Experiences on an Urban Pediatric Population*, Child Abuse Negl. 2011 June; 35(6): 408-413.

[14] Shonkoff JP, Garner AS, et al., *The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, Pediatrics. 2012;129(1): 232-246.

resilience-building, rather than focused solely on identifying the ACEs themselves.[15] In fact, "[t]he experience of childhood adversity and trauma must be managed throughout life. While young people may have received intervention and support to cope with an issue at one point, the same issue may resurface in a different form as they hit a new stage of development."[16] Mr. Thomas was afforded little, if any, meaningful intervention or treatment, at any stage of development to address the impact of his ACEs on his developing brain.

**c. Dr. Aaron's overview of adolescent development and recidivism in adolescents who sexually offend further summarizes the relevance of Mr. Thomas' age, only 18 years old — an adolescent by the very definition— at the time of the offense conduct.**

The defense retained Dr. Jeffrey Aaron – a Clinical and Forensic Psychologist who is an Assistant Clinical/Teaching Professor of Psychiatry & Neurobehavioral Sciences at the University of Virginia School of Medicine, and also a Juvenile Justice & Behavioral Health Program Manager/Forensic Programs Consultant with the Virginia Department of Behavioral Health & Developmental Services – to prepare a report that generally addressed: (1) the relationship between adolescent developmental status and behavior and (2) research on recidivism in individuals who offend sexually in adolescence.

---

[15] Substance Abuse and Mental Health Services Administration (SAMHSA)., *SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach*, U.S. Dept. of Health and Human Services, 2014 July.

[16] The Annie Casey Foundation, *The Road to Adulthood, Aligning Child Welfare Practice with Adolescent Brain Development* 12- 13 (2017), http://www.aecf.org/m/resourcedoc/aecf-theroadtoadulthood-2017.pdf.

As Dr. Aaron explains, the legal line drawn at age 18 does not reflect a meaningful developmental boundary. Brain regions governing planning, judgment, and impulse control "do not reach full maturation until the mid-twenties," and older adolescents "regularly fail to apply" adult-like cognitive abilities in real-world, emotionally charged situations even when they possess the underlying capacity to reason more maturely in calmer settings. *See* Exhibit 1 (Aaron Report) at pgs. 2-3. This gap between theoretical capacity and real-world functioning — what Dr. Aaron terms the "maturity gap" — is not a matter of choice or volition, but a genuine, brain-based limitation common to older adolescents as a group. *Id.* at pg. 5.

This understanding of adolescent brain development takes on particular significance when considered alongside Mr. Thomas' documented history of childhood adversity. *See supra Section IV. B.* Dr. Aaron's report notes that "[a]dverse early experiences, including family influences, have been shown to have a lasting, if potentially reversible, impact on general functioning, risk-taking behaviors, legal involvement, and thinking/reasoning capacities." *Id.* at pg. 4. Mr. Thomas' childhood — marked by the ACEs described above — reflects precisely the kind of adversity Dr. Aaron identifies as compounding the developmental vulnerabilities already inherent in adolescence. Where a young person's environment offers little support during these formative years, as Dr. Aaron explains, the effects are not confined to the moment of adversity but "reverberat[e]," impacting the later development of "social skills, behavioral controls, and emotional functioning." *Id.*

Relatedly, Dr. Aaron's report also notes that for adolescents generally, sexual offending "is more likely to be a result of a temporary set of behaviors that includes adolescent developmental status than it is to be something that should be expected to continue, particularly when appropriate interventions occur." *Id.* at pg. 7. This conclusion is grounded in decades of research on adolescent brain development and corroborated by low rates of sexual recidivism among youth offenders (ranging from 7% to 13% across multiple large-scale meta-analyses). *Id*. Accordingly, Mr. Thomas' offense conduct at 18-years-old is properly understood not as a fixed reflection of who he is, but as behavior substantially shaped by a developmental stage he has not yet even moved beyond, at just age 24, which was also compounded by a childhood defined by trauma he did not create and was never adequately addressed. While Mr. Thomas serves his lengthy prison sentences, the hope is that he will finally be availed of appropriate, trauma-informed intervention and treatment.

**d. Even the Sentencing Commission and the Courts recognize the mitigating role of an offender's age and the low risk of recidivism for older offenders.**

The Sentencing Commission and the Supreme Court have acknowledged the mitigating impact of a defendant's youth at the time of the offense conduct.

In 2010, the U.S. Sentencing Guidelines policy statement concerning age was amended to encourage courts to consider a defendant's youth as a mitigating factor in sentencing more frequently.[17] In the following years, the Sentencing Commission

[17] *See* U.S.S.G. § 5H1.1 ("Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in

acknowledged in 2017 the growing consensus in neuroscience and case law that a person's decision-making and emotional control faculties may not be fully developed until age twenty-five,[18] and even adopted stronger language in 2024 permitting a downward departure or alternative to incarceration based on youthfulness.[19] Although the November 2025 Amendments to the Sentencing Guidelines removed the policy statements, "[t]he Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts previously identified as a basis for departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a),"[20] including a defendant's youth as a mitigating factor.

Like the Sentencing Commission, the Supreme Court has in the past decade recognized youth as a mitigating factor. In *Miller v. Alabama*, 567 U.S. 460, 471–72

---

combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.").

[18] U.S. Sentencing Commission, *Youthful Offenders in the Federal System*, at pg. 5 (May 2017), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research- publications/2017/20170525_youthful-offenders.pdf ("The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average.").

[19] U.S. Sentencing Commission, Amendments to the Sentencing Guidelines, § 5H1.1 (April 17, 2024) available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202404_prelim-rf.pdf.

[20] *See* United States Sentencing Commission, *Chapter One- Annotated 2025 Chapter 1*, available at https://www.ussc.gov/guidelines/2025-guidelines-manual/annotated-2025-chapter-1 (last visited Sept. 17, 2026).

(2012), the Supreme Court relied on neuroscience in holding that sentencing people to mandatory life without parole for crimes committed as juveniles violated the Eighth Amendment. The Court held that individuals under age eighteen have the possibility to reform as they grew older. *Id.* The Supreme Court has also recognized that youth is a profound mitigating factor when considering crimes committed by a teenager. *See Montgomery v. Louisiana*, 134 S.Ct. 718, 734 (2016) (stating that only in the rarest cases will the transient immaturity defining "youth" fail to decisively mitigate against life imprisonment for murder).

Additionally, as reflected in the Sentencing Commission's recent research, the older people are when they are released, the less likely they are to recidivate.[21] Individuals who are released from incarceration between 50 to 54 years old had only a 6.8% risk of recidivating, and those 55 to 59 years old had a 4.9% risk of recidivating.[22]

These recognized principles regarding an offender's youth at the time of offense and that older offenders are less likely to recidivate apply equally to Mr. Thomas. He was 18-years-old when he committed the offense conduct, and has been detained since

---

[21] U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at 30 (Dec. 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf ("Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older. The pattern is consistent across age groups, as age increases recidivism by any measure declined. Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average.").

[22] *Id.*

he was that age (just right before his 19th birthday). As reflected above, Dr. Aaron concluded that youthful offenders are less likely to reoffend as they transition to adulthood. Although Mr. Thomas has several state convictions – starting from when he was just 16 years old until 18 years old, they are all within a short timeframe when he was still a teenager. And given the length of his sentence, by the time that he is released from incarceration, he will be 54 years old and pose a low risk of recidivating.

**e. Mr. Thomas possesses protective factors that will serve to support and sustain him as he navigates decades in prison.**

[redacted], he persevered through school and was able to earn his GED in 2019. PSR at ¶ 240. His mother had taken him out of traditional school due to the difficulties he was suffering due to her health struggles and being bullied. *Id.* However, Mr. Thomas' academic achievement remained evident as he was able to gain entrance and begin his college studies at Norfolk State University when he was not yet 18 years old. *Id.* at ¶ 238.

While in prison, Mr. Thomas hopes to continue college courses to better himself and positively impact those around him. He enjoys almost daily contact with his mother and biological father, as well as his siblings, and feels like he has their support, which is also an important protective factor as Mr. Thomas faces decades in prison. *Id.* at ¶ 223. His extended family has also remained supportive and know a very different person than the facts of this case portray. Mr. Thomas' cousin, Thais Sebastian, describes him as a "respectful, hardworking, protector of his family" and while Mr. Sebastian acknowledges the harm Mr. Thomas has caused, he is "prepared

to support him and hold him accountable as he moves forward…[and] continue to encourage him to make responsible decisions, surround him himself with positive influences, and work toward becoming the man he is capable of being." *See* Exhibit 2 (Letter of Thais Sebastian) at pg. 1. This support and positivity will be crucial for Mr. Thomas' well-being during a very long prison sentence.

Importantly, Mr. Thomas' time in pretrial detention and the incidents that have occurred during those detentions do not adequately capture his long-term desire to rehabilitate himself. For the past 6 years, Mr. Thomas has been bouncing around different facilities with the threat of an effective life sentence hanging over his head. When he finally came to terms with his 30-year state sentence and was designated to a Virginia state prison, he was then federally prosecuted in this case for related conduct that happened more than 5 years before, when he was 18 years old, and looking at another potential life sentence. Without minimization, he engaged in behavior while awaiting trial or sentencing at the local jails that was disruptive and concerning. [redacted]. Once Mr. Thomas has certainty as his term of imprisonment and is redesignated to a prison, then he will be in a mental space where he can be forward-looking and plan for his future – both while serving a sentence and then what life will look like for him afterwards.

**f. A concurrent sentence of 35 years would not cause unwarranted sentencing disparities for similarly situated defendants.**

The defense is recommending that the Court holistically sentence Mr. Thomas to a sentence of 35 years for the offense conduct he did over several months when he was 18 years old. To effectuate that sentence, Mr. Thomas' federal sentence would both be adjusted for the time he has already served on his state sentences and to run concurrent with the remaining undischarged term of incarceration. He will be released when he is 54 years old. This is a significant sanction, and would not cause sentencing disparities among similarly situated defendants both in this courthouse and across the country.

In this district, courts have imposed sentences that are almost a decade lower than the defense's recommendation for defendants who are older, sexually exploited various minors over a longer period of time, and were involved in networks dedicated to exploiting minors:

- *United States v. Vincent Joseph Sarikey*, 1:23-cr-00056 (LMB). The defendant was 28 years old at the time of the offense conduct, and the Court imposed a 25-year sentence. The defendant pleaded guilty to one count of sexual exploitation of a minor based on the defendant's exchanging Telegram messages with another individual to acquire and trade images of minors, and he sent three videos of a 15-year-old minor that he had been communicating with and paid money to receive sexually explicit images and videos. He also attempted to produce child sexual abuse material with a 12-year-old minor. In addition, the defendant abused and exploited minors for almost a decade. He committed hands-on offenses with an 8-year-old and produced child sexual abuse material of that minor, which formed the basis for another federal case in the Southern District of Indiana. He had over 20,000 images, 500 videos, and 11 "other" items of child sexual abuse material.

- *United States v. Warren Wong*, 1:22-cr-00232 (PTG). The defendant was 18 years old at the time of the offense conduct, and the Court imposed a 22-year sentence. The defendant pleaded guilty to 7 counts of sexual exploitation of a

minor based on his online communications with at least 8 minors, who were as young as 11-years-old. Throughout various online platforms, the defendant exploited these minors to send sexually explicit photos and images of themselves, but also to send those images to each other. On one video call, he directed the minors to engage in sexual acts together while on a video call for him to watch, and attempted to extend the abuse to the minor's sibling – such as to rape his younger sister. He also trafficked in child sexual abuse material, and sought out material to build his collection.

- *United States v. Vincenzo Leonardi*, 1:16-cr-00247 (LMB). The defendant was 22 years old at the time of the offense conduct, and the Court imposed a 15-year sentence. The defendant pleaded guilty to one count of sexual exploitation based on his online communications through social media for over a year with minor boys to take videos of themselves masturbating or photos of their genitals by pretending to be an 11-year-old girl. He did this with six boys and attempted to do so with 12 more, with minors as young as 9-years-old.

- *United States v. Allen Cortez*, 1:16-cr-00128 (TSE). The defendant was 31 years old at the time of the offense, and the Court imposed a 17.5-year sentence. The defendant pleaded guilty to sexual exploitation of a minor based on his involvement in a sophisticated conspiracy to produce child pornography by coercing and enticing minors to engage in sexually explicit conduct on web camera. The conspiracy resulted in the victimization of more than 300 minors and thousands of child pornography.

- *United States v. David Alexander Battle, II*, 1:15-cr-00274 (CMH). The defendant was 23 years old at the time of the offense conduct, and the Court imposed a 25-year sentence. The defendant was convicted after a jury trial of four counts of sexual exploitation of a minors, one count of attempted coercion and enticement of a minor, and two counts receipt and one count of distribution of child pornography. The defendant came to law enforcement's attention because he was streaming a child-pornography video to Omegle. On his phone, he had conversations with the chat application Kik with at least 5 minor boys where he pretended to be a minor girl. The defendant knew at least two of the minors, where he volunteered with the minor's band and chaperoned a field trip, and was a family friend of the other minor's family.

- *United States v. Friedel*, 1:14-cr-383 (TSE). The defendant was 29 years old at the time of the offense conduct, and the Court imposed a 16-year sentence. The defendant enticed at least 5 minors to take and send to him sexually explicit images of themselves, including one whom he enticed to actually have sex with him (events that he recorded in videos and images), one to whom he distributed other child pornography, and multiple minors he threatened with exposure, and parental abandonment if they did not cooperate with his demands.

- *United States v. Calderon Velasquez*, 1:13-cr-89 (AJT). The defendant was 27-years-old at the time of the offense conduct, and had a prior conviction in Wisconsin for having sexual intercourse with a minor. The Court imposed 16 years. The defendant used the internet to convince a minor that "a hacker had taken her sexually explicit videos and photographs and was threatening to post them publicly, unless the defendant intervened on her behalf," for a price – her continued stripping and masturbating during livestreams that he would record. He did this with at least two other known minors, one of whom he had actually traveled across states to see. He also absconded from pretrial supervision and later "admitted that he had been online yet again."

When looking at cases more broadly across the country for similarly situated defendants, Mr. Thomas would still be receiving a lengthier sentence for similar, if not more aggravated conduct:

- *United States v. Matthew Jackson*, 4:24-cr-00018 (D. Alaska). The defendant was 23 years old at the time of the offense conduct. He was sentenced to 30 years' incarceration after pleading guilty to cyberstalking and several counts of sexual exploitation of a minor. According to the government's sentencing position paper, for two years, the defendant directed three minors to send him sexually explicit photos and then used those photos as blackmail to force sexual contact with the minors. He took photos and videos of the sexual encounters, and would provide alcohol or marijuana to the minors. In addition, the defendant repeated the same behavior with adult women. The defendant also had a criminal history that involved multiple assaults on family members.

- *United States v. Marquez Cameron Jones Weston*, 3:24-cr-00090 (S.D. Mississippi). The defendant was 22 years old at the time of the offense conduct. He was sentenced to 27 years after pleading guilty to attempted sexual exploitation of a minor, transportation of child pornography, two counts of extortion/threat of violence or physical harm, and cyberstalking. For a little under one year, the defendant ran a "sextortion scheme" where he attempted to and extorted money and sexually explicit photos and images from at least 47 females over the internet, some of them including minors.

- *United States v. Samson Ogoshi and Samuel Ogoshi*, 2:22-cr-00025 (W.D. Michigan). The defendants (brothers) were 19 and 20 years old at the time of the offense conduct, and were extradited from Nigeria. They were sentenced to 17.5 years' incarceration for conspiracy to sexually exploit more than 100 victims – including at least 11 minors – and one minor committed suicide as a result of the scheme. According to the defense's and government's sentencing

position paper, these defendants pretended to be a young woman in social media accounts and sought to have teenage boys engage in sexually explicit conduct to produce a visual depiction of that conduct so that they could then blackmail the victims by threatening to send the images to others. The defendants shared resources and methods to engage in that conduct.

- *United States v. Kyle Peterson*, 1:22-cr-00113 (S.D. Indiana). The defendant was 25 years old at the time of the offense conduct. The defendant was sentenced to 22 years' incarceration after pleading guilty to a one count criminal information for sexual exploitation of a minor. The defendant used Omegele and Snapchat to contact at least five minors. For the defendant's interactions with the 12-year-old minor that formed the basis for the federal charge, the defendant sent her sexually explicit images and videos – including sadomasochistic behavior and the sexual abuse of animals. He then engaged in sexually explicit chats with the minor and instructed her to send him videos of herself; when she stopped doing so, he threatened to disseminate her sexually explicit images and videos to her friends and family.

And lastly, as a point of comparison, a 35-year concurrent sentence in this case would result in a sentence that is more than a decade longer than the national mean or median sentence for federal *murder* in every fiscal year for the last decade:

| **Year** | **Mean** | **Median** |
|---|---|---|
| 2025[23] | 286 | 292 |
| 2024[24] | 274 | 240 |
| 2023[25] | 285 | 276 |

[23] U.S. Sentencing Commission, *Fiscal Year 2025 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2025), available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard.

[24] U.S. Sentencing Commission, *Fiscal Year 2024 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2024), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/Table15.pdf.

[25] U.S. Sentencing Commission, *Fiscal Year 2023 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2023), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table15.pdf.

| | | |
|---|---|---|
| 2022[26] | 261 | 240 |
| 2021[27] | 244 | 231 |
| 2020[28] | 255 | 228 |
| 2019[29] | 255 | 240 |
| 2018[30] | 291 | 292 |
| 2017[31] | 224 | 180 |
| 2016[32] | 241 | 210 |

[26] U. S. Sentencing Commission, *Fiscal Year 2022 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2022), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/Table15.pdf.

[27] U. S. Sentencing Commission, *Fiscal Year 2021 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2021), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table15.pdf.

[28] U. S. Sentencing Commission, *Fiscal Year 2020 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2020), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/Table15.pdf.

[29] U. S. Sentencing Commission, *Fiscal Year 2019 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2019), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table15.pdf.

[30] U. S. Sentencing Commission, *Fiscal Year 2018 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2018), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/Table15.pdf.

[31] U. S. Sentencing Commission, *Fiscal Year 2017 Sourcebook of Federal Sentencing Statistics*, *Sentence Length in Each Primary Offense Category* (2017), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/Table13.pdf.

[32] U. S. Sentencing Commission, *Fiscal Year 2016 Sourcebook of Federal Sentencing Statistics*, *Sentence Length in Each Primary Offense Category* (2016), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2016/Table13.pdf.

In light of these sentences, if the Court were to impose a sentence consistent with the government's request, then that would result in significant sentencing disparities and would entirely fail to account for the fairness and equity contemplated by U.S.S.G. § 5G1.3, Mr. Thomas' youth, and the other mitigating factors set forth under 18 U.S.C. § 3553(a).

## V. Conclusion.

When imposing a just sentence, "the punishment should fit the offender and not merely the crime," *Pepper v. United States*, 562 U.S. 476, 477 (2011). Accordingly, for all the above stated reasons and those at the upcoming hearing, the defense submits that a 35-year concurrent sentence, that is adjusted for the time that Mr. Thomas has already served on his state sentences, is sufficient but not greater than necessary to serve the goals of sentencing in this case.

Pursuant to § 5G1.3, the defense would propose the following language to be reflected in the judgment:[33]

The defendant is COMMITTED to the custody of the Bureau of Prisons for a term of 35 years to commence immediately and to run concurrently with two Virginia state cases (Prince William County Circuit Court Docket Nos. CR21001363-00, CR21001364-00, and Fairfax County Circuit Court Docket Nos. FE-2021-659, FE-

[33] Undersigned counsel has conferred with the Bureau of Prisons Office of General Counsel about this proposed language, as well as referred to guidance provided by the Sentencing Commission. *See* Sentencing Commission, *Undischarged Terms of Imprisonment*, available at https://www.ussc.gov/sites/default/files/pdf/training/decision-trees/5G13_quick-guide.pdf.

2021-661). Pursuant to U.S.S.G. § 5G1.3(b), the imposed term of incarceration is hereby reduced by 5 years, 11 months, and 24 days to account for the defendant's confinement from October 1, 2020 until September 24, 2026, in relation to the two state Virginia state cases (Prince William County Circuit Court Docket Nos. CR21001363-00, CR21001364-00, and Fairfax County Circuit Court Docket Nos. FE-2021-659, FE-2021-661), that would not otherwise be credited by the Bureau of Prisons.

* * * * *

Date: September 18, 2026

Respectfully submitted,

**MALACHI MORGAN THOMAS**

by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by: ____/s/_______________
Brittany M. Davidson
VA Bar No. 90660
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
Telephone: (703) 600-0817
Fax: (703) 600-0880
Brittany_Davidson@fd.org